IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DAVID A. ENGLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | 4:08CV3218 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | **MEMORANDUM** |
| Commissioner of Social Security, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

David A. Engleman (Engleman), a young man in his early twenties, suffers from bipolar disorder and attention deficit hyperactivity disorder (ADHD). He has had lots of jobs, but he cannot keep them. The administrative law judge (ALJ) concluded that these mental problems would not stop Engleman from working as a cleaner, housekeeper or janitor. Contending that the ALJ erred when he found that the claimant was not "disabled" within the meaning of the social security laws, Engleman appeals. In a well-written brief, he asserts that: (1) the judge misunderstood the nature of bipolar disorders and "GAF" scores; (2) the judge failed to properly evaluate the opinions of a social worker and a psychiatric nurse; (3) the judge's conclusion that Engleman could engage in substantial gainful activity was not supported by the evidence; and (4) the judge failed to weigh the conflicting opinions of two vocational experts, one hired by Engleman and one hired by the Social Security Administration.

The appeal will be denied. There is substantial evidence in the record from which the ALJ could reasonably conclude that Engleman's mental condition was not disabling. Furthermore, the ALJ committed no legal error. A brief elaboration of these findings and conclusions are set forth below.

## I.  BACKGROUND

Engleman was born on August 2, 1984.  (Tr. 20.)  He filed the application for benefits on December 17, 2004, when he was 20 years old.  (Tr. 21.)   His hearing before the ALJ was conducted on August 28, 2007.  (Tr. 12.)  His primary complaint centered on mental problems.

Before proceeding further, it is helpful if one understands Axis V or GAF (global assessment of functioning) scores in the context of a mental status examination.  A GAF score is a method of "reporting the clinician's judgment of the individual's overall level of functioning."   American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, at pp. 30-32 (4th ed.) (DSM-IV).   The scores range from 0 to 100.  *Id*. at p. 32.  The lower the score the lower the level of functioning.

For example, a GAF score of  51 to 60 suggests moderate difficulty in social, occupational, or school functioning while a GAF score of 41 to 50 suggests serious impairment in social, occupational or school functioning.  *Id.*  For our purposes, the difference between a GAF score in the fifties and a GAF score in the forties is the difference between "*moderate* impairment in occupational functioning" and "*seriou*s impairment in occupational functioning."  *See*, *e.g.*, *Cox v. Astrue*, 495 F.3d 614, 620 & n. 5 (8th Cir. 2007) (comparing a "GAF" score of 65, indicative of mild symptoms where the individual generally functions reasonably well, with GAF scores in the forties and fifties) (italics added).

In 2005, A. James Fix, PhD, a clinical psychologist, examined Engleman at the request of the Social Security Administration.  (Tr. 276-281.)  After that examination, Dr. Fix gave the following diagnosis and explanation:

DIAGNOSIS:

| | |
|---|---|
| AXIS I: | Bipolar disorder, by history. |
| | Alcohol Dependence, untreated. |
| AXIS II: | Rule out personality disorder, not otherwise specified. |
| AXIS III: | Hearing loss, right ear, reported. |
| AXIS IV: | Moderate. |
| AXIS V: | Current 45, highest 55. |

In terms of the supplemental questions that accompanied the claimant's referral, there do not seem to be restrictions of the activities of daily living.  The claimant in the past has shown irritability and some friction socially.  He states that he can become irritable under stress.  He shows adequate concentration and attention, and he can understand and remember instructions.  The claimant has some problems with the authority, but otherwise, he is able to handle the responsibilities with ordinary supervision that would appear.  He is able to relate appropriately to other people.  He can adapt to changes in his environment.

The claimant has overused alcohol and would probably not be allowed to handle his own finances.

(Tr. 279-280.)

    With caveats, Dr. Fix found that Engleman had the ability to sustain concentration and attention needed for task completion, he had the ability to understand and remember short and simple instructions, the claimant had the ability to carry out short and simple instructions under normal supervision, Engleman had the ability to relate appropriately to co-workers and supervisors, and he had the ability to adapt to changes in the claimant's environment.  (Tr. 281.)  Dr. Fix did not think Engelman could manage his own funds due to "severe alcohol misuse."  (Tr. 281.)

    With the exception of the relatively low GAF score noted by Dr. Fix, other doctoral level psychologists or psychiatrists, who treated Engleman before he applied

-3-

for benefits, came to similar conclusions.   Engleman's problems were somewhere between mild and moderate.  A summary of their views follows.

Elizabeth A. Heidt, PhD, a clinical psychologist, reported in March of 2003 that the claimant's attention span was within normal limits, his concentration span was within normal limits, his fund of knowledge was normal, his intelligence was average, his judgment was within normal limits, his reality testing and insight were realistic, his decision-making capacity was within normal limits, and his organization skills were logical and goal directed.  (Tr. 400.)  She diagnosed the claimant with an adjustment disorder with anxious mood and anxiety disorder not otherwise specified with a current GAF score of 60.  (Tr. 402.)  She thought he would benefit from assistance in building anger-management skills.  (Tr. 402.)

Dr. Heidt's observations in 2003 were generally consistent with her earlier observations.  In 2002, Dr. Heidt concluded that the claimant had an attention deficit hyperactivity disorder, combined type, with oppositional defiant disorder and his GAF score was "55-60."  (Tr. 407.)   She stressed that "anger-control strategies, conflict resolution skills, and careful decision-making" should be reinforced.  (Tr. 408.)  In 2000, Dr. Heidt diagnosed the claimant as suffering from a disruptive behavior disorder not otherwise specified and she said his current GAF score was 60. (Tr. 411.)   Again, she stated that Engleman would "benefit from assistance in developing alternative anger control strategies."  (Tr. 411.)

Karen Reinertsen, M.D., a psychiatrist, examined the claimant on June 18, 2003.  Engleman's mother complained that the claimant had "some problems with anger management and she expresses concern that he finds it hard to keep a job due to his attitude and anger problems."  (Tr. 317.)   After an examination, the doctor concluded, among other things, that Engleman's "[i]nsight and judgment appeared to be approximately intact for age . . ., [c]ognition appeared to be in the average range [and] [b]ehavior was cooperative."  (Tr. 318.)  She described the claimant's assets to

-4-

be: "Good verbal skills.  Socially engaging.  Supportive family."  She described his liabilities to be:  "Impulsivity."   At Axis I, the doctor gave the following diagnosis: "Mood disorder, NOS" and "Rule out hypomania" and "Rule out ADHD."  (Tr. 318.) She gave a GAF score of 65.  (Tr. 618.)  Medications (including antidepressants and sleep aids) were thought to be appropriate.  (Tr. 317-318.)

Dr. Reinertsen referred Engleman for a psychological evaluation and on September 17, 2003, Glen Palmer, a PhD in psychology, conducted such an examination.   (Tr. 312-315.)  Dr. Palmer diagnosed Engleman as suffering from "Bipolar II disorder" and "attention-deficit/hyperactivity disorder" and he gave the claimant a GAF score of 65.   (Tr. 315.)  He recommended ongoing treatment with drugs and he stressed that "[i]nterpersonal skills training will be essential for [Engleman] to succeed in a work environment[,]" noting that he "has demonstrated significant difficulties with sustaining employment at this point."  (Tr. 315.)

Engleman's parents requested a further evaluation and Dr. Palmer completed that evaluation on October 20, 2003.  (Tr. 305-309.)  Among other things, Dr. Palmer found that: (1) Engleman had an average I.Q.  (Tr. 307); (2) on achievement tests, he had a significant deficit in math (Tr. 308); (3) Engleman had "[m]oderate . . . [p]roblems with occupational functioning" (Tr. 308); and (4) he had a GAF score of 65.  (Tr. 308.)

Engleman also saw a psychiatric nurse and a social worker on a sporadic basis. The medical records from those professionals are in evidence.  (E.g., Tr. 338-340; 341-397.)  Each of these professionals provided the ALJ with a letter summarizing their views.

In a letter dated August 17, 2007, Linda Berry, the nurse, wrote the following:

In connection with David Engleman's upcoming Social Security Administration hearing, I'm faxing his most recent progress note to you which includes his current GAF as requested.[1]

I have been seeing Mr. Engleman sporadically dating back to 1/11/05. Follow-up visits were on 3/22/05, 2/10/06, 3/23/06, 11/16/06 and then not again until his most recent visit on 6/25/07. As you can see, Mr. Engleman hasn't maintained any consistent follow-up with me. He has had a number of no-shows.

I do believe that the above poor compliance with treatment is representative of Mr. Engleman's mental illness. He has demonstrated very poor motivation, significant mood swings, inability to maintain employment, and inadequate social adjustment.

Mr. Engleman has lost and/or quit jobs in relation to his inability to control his anger. He is unable to accept criticism and I believe this has ended with his walking off the job and simply not returning. He also has had a very difficult time with motivating himself to get up in the morning with [sic] has also resulted in termination from employment. I'm fairly sure that he's been tardy on multiple occasions. He, in fact, has demonstrated this more than one [sic] in his showing up late for his appointments with me.

I believe that Mr. Engleman will have substantial difficulty in maintaining any gainful employment and would support his endeavor for Social Security disability.

(Tr. 338.)

David Kreutzer, a social worker, provided a letter dated August 28, 2007. It gave this summary:

---

[1]That score was 55. (Tr. 339.)

I am writing this letter in addition to the records that are requested on David Engelman who I have known as a patient since February 2, 2000 when he first started counseling with me.[2]

David then 16, presented with the problem issues of irritability, argumentativeness, very poor performance in school often not completing his homework, impulsiveness and social skills that were much younger than his chronological age. David had failed classes in school to the point that he graduated several years behind the kids of his same age group. His graduation only happened due to the support, encouragement and perseverance of his parents.

In addition to David's problems with education he also has repeatedly evidence [sic] problems in other areas of his life. These include relationships. He continually cycles between doing well with his parents and fighting with them. This cycle also has been seen in the romantic arena where David has repeatedly been in numerous relationships with females. David initially views them as "the one for him" but within several months these relationships self destruct. These relationships have shown repeatedly to have the dynamics of the girl taking care of David emotionally and financially.

David continually has shown very little insight into the dynamics of his problems and views the problems in his life as all being externally caused. In addition he has little ability to understand or track the symptoms of his disorder. Initially it caused him problems in school and relationships. With him getting older and being out on his own for the past 3 years his problems have increased to not being able to hold a job, have significant relationships, handle money appropriately or recreate. If David is allowed to go on disability it is my recommendation that David not be appointed the payee for his money. Instead it would be in David's best interest for his parents Marv and Teri Engelman to be appointed as the Payee's.

_____

[2]At the hearing, Engleman testified that he had not seen Kreutzer for several years. (Tr. 428.) The medical records from Kreutzer establish that Engleman saw Kreutzer only a few times after 2003. (Tr. 342-345.)

(Tr. 341.)

Engleman testified at the evidentiary hearing. (Tr. 417-432.)  He was 23 years old at that time  (Tr. 417.)  Among other things he stated that he graduated from high school (albeit with difficulty) and he attended community college where he failed to pass a single class.  (Tr. 417-418.)  Engleman stated that he had "probably over 10 jobs"– doing such things as working at fast food establishments and grocery stores and doing maintenance work at apartment complexes–but he always got fired.  (Tr. 418, 423.)  He described his problems as the "inability to stay on task[,] "[a]nger problems[,]" "I have problems with authority figures[,]" "[n]ot showing up[,]" "[s]howing up late[,]" and "[n]ot learning quick enough."  (Tr. 418.)   While he obtained a driver's license, he lost it for failing to pay for a speeding ticket. (Tr. 422.)

Engleman testified that he had recently contacted Linda Berry, the psychiatric nurse, in order to start again on his medications.  (Tr. 421-423, 428-429.)   He had consulted her earlier, but then broke off contact with her.  Restarting his medications helped him from getting "angry as quickly" and kept him "in a better mood."  (Tr. 429.) The motivation for the "sudden change in frequency" of seeing Ms. Berry again was "to get my mental stuff under control so I can start being a productive member of society."  (Tr. 428.)   Before seeing Ms. Berry most recently, the only time he would consistently take his medications was when he was living with his parents. (Tr. 427.)  Engleman "moved a lot[,]" sometimes living with friends and other times living with his parents or grandparent.  (Tr. 425-426.)

Although no guardianship had been commenced, the claimant's mother testified that she and the boy's father pressured the claimant to file the application for social security benefits.  (Tr. 437.)  Mrs. Engleman stated that she and her husband were supplying the claimant's medication with assistance from their insurance company.  (Tr. 438-439.)   In that vein, she worried that if the claimant did not obtain social security benefits by the time he turned 24, the parents' insurance would stop

-8-

covering him and the claimant would be without funds to pay for the medications. (Tr. 439.)

In addition, she described the boy's early childhood and school years.  In particular, Mrs. Engleman said that she and her husband adopted the claimant after the child had been placed in foster care because the birth mother had badly neglected him.  (Tr. 435-436.)  While the claimant had graduated high school, he had a learning disability associated with math.  (Tr. 435.)

Although the young man was "very capable of obtaining a job" according to his mother, he "cannot keep a job."  (Tr. 435.)   He lost his employment, according to his mother, because he lacked "focus" as a result of his bipolar condition.  (Tr. 436-437; 441-442.)  He "was never where he was supposed to be" and "would not follow any rules."  (Tr. 435.)  According to his mother, her son was a "manipulator."  (Tr. 443.)  She said that the claimant was either homeless or he stayed with his parents or grandparents.  (Tr. 436.)  The claimant engaged in a pattern of taking prescription medications for a week or two and then stopping when he felt better.  (Tr. 438.)  When he failed to take the drugs, "then things go bad again" and "[h]e'll lose a job and then he'll be homeless again and, be out on the streets.  He has no driver's license, he has no car.  He has nothing."  (Tr. 438.)

At the evidentiary hearing, Engleman's lawyer presented his own vocational expert.  That expert was Dean Venter.  (Tr. 447-464.)  Venter interviewed Engleman and reviewed the evidence.  (Tr. 449.)   Noting the GAF score of 45 given to Engleman by Dr. Fix and the GAF score of 55 given to Engleman by Ms. Berry, Venter held the opinion that Engleman could not maintain substantial gainful employment because of his lack of focus and the inability to control his anger.  (Tr. 449-453.)

The ALJ then examined Gail Leonhardt, the vocational expert employed by the Social Security Administration.  Leonhardt testified that Engleman had no past relevant work given his age and the short duration of his former jobs.  (Tr. 465-466.) Considering Engleman's vocational profile, Leonhardt also expressed the opinion that the claimant could find substantial gainful employment in the national and local economy doing cleaning and janitorial work assuming that Engleman had no physical impairments and assuming further that his mental impairments were as follows: (1) mild limitations regarding the ability to understand and remember short and simple instructions; (2) moderate limitations regarding the ability to carry out short and simple instructions; (3) moderate limitations regarding the ability to understand and remember detailed instructions; (4) marked limitations regarding the ability to carry out detailed instructions; (5) mild limitations regarding the ability to make judgments on simple work related decisions; (6) mild limitations regarding the ability to interact appropriately with the public, co-workers and supervisors provided that the contact with co-workers and supervisors was occasional, brief, specific and directly related to job processes; (6) moderate limitations regarding the ability to respond to work pressures in the usual work setting; and (7) mild limitations regarding the ability to respond to changes in the work setting.  (Tr. 466-470.)

On March 18, 2008, the ALJ decided that Engleman was not "disabled." (Tr. 21.)  The ALJ concluded that (1) Engleman had no past relevant work; (2) Engleman suffered from bipolar disorder and ADHD and, while they were severe, those impairments did not meet the "Listings"; (3) Engleman had the residual functional capacity to perform unskilled simple jobs such as cleaner, housekeeper or janitor; and (4) there were a significant number of such jobs in the economy.  (Tr. 14-21.)

## II.  ANALYSIS

Applying the well-known "substantial evidence in the record as whole standard" of review for evidentiary sufficiency and the *de novo* standard of review

-10-

for legal errors, I next consider and reject each of the four arguments advanced by Engleman. In short, the decision is supported by substantial evidence and the ALJ made no legal errors.

Initially, Engleman claims that the ALJ erred because he misunderstood the nature of a bipolar disorder and GAF scores. Specifically, Engleman argues that the ALJ erred because he attributed some significance to Engleman's failure to take medications without realizing that such a failure is a part of the claimant's mental illness. Moreover, Engleman argues that the ALJ placed too much significance on GAF scores to the exclusion of other evidence. I am not persuaded.

The ALJ's reference to Engleman's failure to take his medication (Tr. 19) was perfectly appropriate even though Engleman may have suffered from the mental illness known as bipolar disorder. *See, e.g., Kelley v. Barnhart*, 372 F.3d 958, 960-961 (8th Cir. 2004) (observing that the "failure to follow prescribed medical treatment without good cause is a basis for denying benefits"; affirming denial of disability benefits for a claimant suffering from a major depressive disorder where there was "a general improvement in [the claimant's condition] when he took his medications, and a general decline in [the claimant's condition] when he failed to take his medications"). The "failure to take prescription medication" as a credibility measure of patients who suffer from a mental illness is appropriate where, as here, the claimant's behavior is knowing and intentional. Engleman testified that he renewed his contact with a psychiatric nurse shortly before the hearing because he understood that he needed his medications "to get my mental stuff under control so I can start being a productive member of society." (Tr. 428.) Consequently, the ALJ could reasonably believe that Engleman's prior failure to take his medication was volitional and therefore relevant to Engleman's credibility regarding the severity of his impairments.

-11-

With regard to the assertion that the ALJ put too much emphasis on GAF scores, the record does not bear out this allegation.  A fair reading of the ALJ's opinion will demonstrate that the judge concentrated not only on GAF scores but also on the narratives and other data provided by the various authorities.  (Tr. 17-19.) Moreover, to the degree that GAF scores were emphasized by anyone, it was Venter, the claimant's vocational expert, and not the ALJ, who keyed on GAF scores (albeit only the low ones).  (Tr. 449-450.)   Simply put, the ALJ's decision was not unduly influenced by GAF scores.

Next, Engleman faults the ALJ for brushing off the opinions of Ms. Berry, the nurse, and Mr. Kreutzer, the social worker.  While it is true that the ALJ concentrated primarily on the recognized medical and psychological authorities (Dr. Fix, Dr. Heidt, Dr. Reinertsen, and Dr. Palmer), and while it is true that the ALJ gave relatively little attention to the views of Berry and Kreutzer[3], there was no error.   To start with, an ALJ has significant discretion in evaluating the strength of "other medical evidence" such as that provided by Berry and Kreutzer.  *See*, *e.g., Lacroix v. Barnhart*, 465 F.3d 881, 885-887 (8th Cir. 2006) (affirming denial of benefits where claimant alleged that she suffered from impulse control disorder, anxiety and depression, among other impairments; stating that therapists and nurse practitioner who comprised claimant's treatment team were not themselves "acceptable medical sources" and adding that the ALJ has more discretion in determining what weight to give to such opinions) (citing *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir.2005)).  By any measure, there were serious weaknesses in the opinions of Berry and Kreutzer.  For example, both Berry and Kreutzer had seen Engleman only sporadically and the conduct they described could just as easily be attributed to adolescent immaturity as mental illness.  In a perfect world it may have been preferable for the ALJ to have devoted more attention to these opinions, but the ALJ's decision is not judged against such a standard.

---

[3]However, it is worth noting that the ALJ specifically recounted (Tr. 18) and then discussed (Tr. 19) the opinions of Berry and Kreutzer.

Thirdly, Engleman asserts that he has never been able to keep a job and he argues that this is definitive proof that he cannot hold a job in a competitive environment. He particularly relies upon *Tennant v. Schweiker*, 682 F.2d 135, 138 (8th Cir. 1982) (where the Court of Appeals, in an opinion written by Judge Heaney, reversed a decision by Judge Urbom and concluded that a claimant who suffered from a personality disorder and who had held 46 jobs in his 12 years of employment with longest tenure at any job being six months was "disabled" within meaning of the Social Security Act and, thus, was entitled to benefits).

The record in this case is quite different from the record in *Tennant* and the other cases relied upon by Engleman. For example, in *Tennant*, the Emeritus Chairman of the Department of Psychiatry at Creighton Medical School concluded that the claimant could not be expected to hold a competitive job where, among other things, the claimant had a personality disorder and "tremendous number of complex contributing impairments" including less than average strength, a bad eye, a speech impairment, less than average IQ, a limited fund of general knowledge, a reformatory record, a failure to benefit from repeated training programs, and possible paranoid tendencies. In contrast, there is compelling evidence in this case from several psychologists and one psychiatrist and otherwise proving that this much younger man's problems are mild or moderate and can be controlled by medication. In sum, the record as a whole is plainly sufficient to support the decision of the ALJ.

Finally, Engleman attacks the ALJ's failure to explicitly weigh the conflicting opinions of Venter and Leonhardt, the dueling vocational experts. Venter heavily relied upon the GAF score of 45 given by Dr. Fix. (Tr. 449 (Venter stated that the one psychological report that "stood out" was the one that "provided a global assessment of functioning score of 45, which by definition . . . would be someone that's unable to hold a job.")) The ALJ explicitly discredited this GAF score for good reason. It was inconsistent with the rest of Dr. Fix's findings. (Tr. 19.) Having rejected a central predicate for Venter's opinion, the ALJ was not required to go any

-13-

further in explaining why he was unmoved by that expert's testimony.  *See*, *e.g.*, *Sykes v. Bowen*, 854 F.2d 284, 287 (8th Cir. 1988) (affirming denial of benefits even though ALJ failed to explicitly discuss why the judge rejected the report of a vocational expert;  it was apparent why the report should be rejected as the report was prepared three years after the claimant's insured status expired).

IT IS ORDERED that the appeal is denied.   A separate judgment will be issued.

DATED this 29th day of May, 2009.

BY THE COURT:

*s/Richard G. Kopf*
United States District Judge

-14-